# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 24 2020, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE INDIANA
DEPARTMENT OF CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationship of: K.S. and C.S. (Minor Children)

and

J.P. (Father),

*Appellant-Respondent,*

*v.*

The Indiana Department of Child Services,

*Appellee-Petitioner,*

and

September 24, 2020

Court of Appeals Case No. 20A-JT-320

Appeal from the Marion Superior Court

The Hon. Marilyn A. Moores, Judge

The Hon. Scott B. Stowers, Magistrate

Trial Court Cause Nos. 49D09-1810-JT-1206 49D09-1810-JT-1207

Child Advocates, Inc.,
*Appellee-Guardian* Ad Litem.

**Bradford, Chief Judge.**

# Case Summary

[1]  J.P. ("Father") and R.S. ("Mother") are the parents of K.S., born on January 31, 2014, and C.S., born on June 6, 2016 (collectively, "the Children"). K.S. was born with methadone in her system, adjudicated a child in need of services ("CHINS"), and left in Father's care when the CHINS case was closed in March of 2015. C.S. was born with methadone in his system, adjudicated a CHINS, and the juvenile court ordered a temporary-trial-visitation ("TTV") placement with Father in October of 2016. Later that month, the juvenile court ordered Father to submit to random drug screens and complete father-engagement services. In October of 2017, Father tested positive for THC and was arrested following an incident of inappropriate discipline of one of the Children's half-siblings. The Indiana Department of Child Services ("DCS") petitioned for the Children's removal from Father's care and to have K.S. adjudicated a CHINS again, which petitions the juvenile court granted. In March of 2018, the juvenile court ordered Father to participate in home-based case management and therapy and random drug screens.

[2]  In October of 2018, DCS petitioned for the termination of Father's parental rights to the Children. Following a hearing held on four days spread out over

several months, during which the juvenile court heard evidence of Father's general non-compliance with court-ordered services, it granted DSC's petitions to terminate Father's parental rights to the Children. Father contends that DCS failed to produce sufficient evidence to fulfill the statutory requirements for the termination of his parental rights. Because we disagree, we affirm.

## Facts and Procedural History

[3] Father and Mother are the parents of the Children, and Father also has three older children from a previous relationship. On or around February of 2014, DCS petitioned to have K.S., who had been born with methadone in her system, and L.L., who is Mother's child with another man, found to be CHINS. On February 28, 2014, Mother admitted that K.S. and L.L. were CHINS. On May 23, 2014, the juvenile court placed K.S. and L.L. with Father, who was either not living with Mother or never had. At a permanency hearing in January of 2015, the juvenile court instructed Father to ensure that Mother did not have access to K.S. and L.L. while they were in his care due to Mother's substance abuse and violent tendencies. In March of 2015, K.S.'s CHINS case was closed.

[4] When C.S. was born in June of 2016, he tested positive for methadone. On June 14, 2016, DCS petitioned the juvenile court to have C.S. adjudicated a CHINS. A DNA test ordered in July of 2016 established that Father was C.S.'s biological father, despite Father's earlier assurances that he would have no contact with Mother. On October 7, 2016, the juvenile court adjudicated C.S. a

CHINS and ordered a TTV placement with Father. The same day, Whitney Smith was appointed as family case manager ("FCM").

[5] On October 28, 2016, the juvenile court ordered Father to submit to random drug screens and complete fatherhood-engagement services. On April 21, 2017, the juvenile court held a periodic-review hearing, after which it ordered that C.S. be continued in his TTV placement with Father, who, at the time, was residing with his sister. Although DCS recommended that the CHINS case for C.S. be closed, the juvenile court declined to do so, at least in part because of a report that Mother had appeared at Father's sister's home and had been arrested for battery. On October 12, 2017, FCM Smith filed a report indicating that Father had tested positive for THC and that his compliance with regular drug screens had been inconsistent.

[6] On October 28, 2017, Father was arrested after an incident of inappropriate discipline of L.L. that left him with bruises on his ankles. The same day, DCS removed the Children from Father's care and petitioned the juvenile court for a change in custody for C.S. based on the disciplinary incident and concerns of substance abuse. On November 1, 2017, DCS petitioned the juvenile court to adjudicate K.S. a CHINS for the same reasons. The same day, the juvenile court ordered the Children removed from Father's care and placed with Mother's sister and directed DCS to make unannounced visits to ensure Father was not at the home.

[7] On January 31, 2018, the juvenile court ordered Father's supervised visitation with the Children suspended following a report of "sexual allegations" made by

one of Father's older daughters and allegations by Mother's sister that Father had abused K.S. and L.L. Tr. p. 66. Although the allegations did not result in criminal charges, DCS substantiated them. DCS was concerned about the allegations, in part, because of the Children's ages—K.S. was four and C.S. was one—and their inability to communicate any abuse that might occur. On February 23, 2018, the juvenile court adjudicated K.S. a CHINS. On March 16, 2018, the juvenile court conducted a dispositional hearing for K.S. and a dispositional-modification hearing for C.S., after which it ordered Father to participate in home-based therapy, home-based case management, and random drug screens. The orders indicated that any missed drug screen would be considered as a positive test result. On October 12, 2018, the juvenile court changed the permanency plan from reunification to adoption after finding that Father had not been engaged in services and had been involved in a recent domestic-violence incident with Mother.

[8] On October 17, 2018, DCS petitioned the juvenile court to terminate Father's parental rights to the Children. The juvenile court held an evidentiary hearing on April 3, April 24, September 12, and December 18, 2019. On April 3, 2018, FCM Smith testified that DCS had requested C.S.'s removal from Father's care in October of 2017 "[a]fter allegations of physical aggression and concerns of substance abuse." Tr. p. 15. DCS referred Father for home-based therapy more than three times during the case. FCM Smith, who was assigned to the case from October 7, 2016, until around June of 2018, had to make "multiple referrals" for random drug screens. Tr. p. 17. By May of 2018, Father's home-

based providers had closed out his services due to Father's lack of engagement. By June of 2018, when FCM Smith left the case, Father's parenting time had been suspended, and Father had not successfully completed any of the services. FCM Smith indicated that Father's participation in drug screening had been sporadic and that he had not taken any drug screens in January or February 2018. FCM Smith did not recommend placing the Children back in Father's care due to his lack of participation and lack of a safe and stable home.

[9] James Heisserer, a home-based therapist at Ireland Home Based Services, worked with Father from October 1, 2018, until January 23, 2019, and testified on April 24, 2019. Overall, Heisserer indicated that he had not gotten "the whole truth" when working with Father. Tr. p. 108. They had met for six out of ten scheduled sessions in Terre Haute. Father's therapeutic goals had included working on any past allegations regarding his neglect of the Children, including sexual and physical abuse Father told Heisserer "that he didn't need this" and "he didn't need to discuss his feelings" in therapy. Tr. p. 99. Father also told him that his criminal charges had been dropped and the allegations did not bother him anymore.

[10] When Heisserer tried to provide Father with coping skills, Father told him that he was "coping extremely well with" not seeing the Children because they had been out of his care for so long. Tr. p. 99. Father also told Heisserer about a back injury he had suffered and how it had limited his ability to work. According to Father, he had injured his back in June of 2017. Father, however, had worked part-time for his uncle, and he told Heisserer that he had a new job.

Heisserer "tried to get deeper" into therapy, but Father lost focus and told Heisserer that he had transportation issues, needed to get to medical appointments, and needed housing. Tr. p. 99. Heisserer worked on getting Father home-based case management services to help with these issues.

[11] Tamara Pogue, another home-based counselor with Ireland, also testified on April 24, 2019, and had started working with Father around Thanksgiving of 2018. Father's goals were focused on housing, employment, budgeting, and helping him get the Children back in his care. Father, however, only met with Pogue once, in December of 2018. Pogue tried to schedule other appointments with him, but Father either cancelled or did not respond. One of those scheduled appointments was for Pogue to transport Father to a psycho-sexual assessment, but he cancelled, saying that he could not make it. Pogue closed out the referral around April of 2019.

[12] Meanwhile, Heisserer had stopped working with Father in January of 2019 when Father moved to Indianapolis and moved in with his sister. Heisserer had tried to reach out to Father "several times," but Father had not responded for four or five days. Tr. p. 102. Heisserer's last session with Father was in January in Indianapolis at 6:30 a.m. at a White Castle restaurant nowhere near his sister's home, which was concerning to Heisserer. Heisserer had the service transferred to Indianapolis in April of 2019 after Father provided him with an address. Heisserer opined that Father needed to complete a psychological evaluation to determine if he had any underlying mental-health issues requiring treatment.

[13] FCM Arielle Bingham had been assigned to C.S.'s and K.S.'s cases in July of 2018, and testified on September 12, 2019, that DCS had had to re-refer Father three or four times for home-based services due to his lack of engagement. Father had never completed home-based case-management services; his referral remained open, but he was not participating. FCM Bingham had never received any reports that Father completed home-based therapy. Father's referral for that service also remained open. FCM Bingham indicated that Father had not visited the Children since the juvenile court suspended his visitation in January of 2018. According to FCM Bingham, Father had been required to engage in home-based therapy, home-based case management, drug screens, and a psycho-sexual assessment and that visits were not reinstated because Father did not complete the psycho-sexual assessment.

[14] Angela Cornett, another therapist with Ireland, also testified on September 12, 2019, that she had provided services to Father, starting in May of 2019 and ending on June 6, 2019. In June of 2019, Father was living with his mother in Poland, Indiana. During their sessions, Cornett tried to engage with Father, but Father told her "several times" that he did not need therapy, "that he has already gone over stuff and that he didn't want to re-open old wounds, old trauma[.]" Tr. p. 116. Cornett opined that without addressing the issues for the referral for therapy, *i.e.*, physical abuse, sexual abuse, and domestic violence, Father would not be able to successfully complete treatment. Cornett attempted to locate Father after the last time they met on June 6, 2019, but Father did not respond to her calls and texts. Yet another Ireland therapist, Sue

Kelly, provided therapy to Father in June of 2019, and another therapist, Teresa Brandenburg, attempted to locate Father in August or September of 2019, apparently without success.

[15] The Children have not been in Father's care since their October 31, 2017, removal. They remain placed with Mother's sister, with whom they have bonded. They are "thriving" in her care, "doing really well[,]" and "bonded together." Tr. p. 151. FCM Bingham opined at the termination hearing that it was in the Children's best interests to terminate Father's parental rights because they do not have a bond with him and he had "not demonstrated that he is able to keep these children safe to provide a permanency living situation for them." Tr. pp. 152–53. FCM Bingham also opined that "[i]t would be devastating to remove them from their current environment and place [them] anywhere else, at this time that is all they know, is their current placement." Tr. p. 153.

[16] GAL Kimberly Iverson was appointed in both the CHINS and termination cases. GAL Iverson never recommended placing the Children back with Father due to his failure to participate in services and lack of housing. GAL Iverson opined that termination was in the Children's best interests. DCS's plan is adoption, and Mother's sister was willing to adopt. GAL Iverson agreed with the plan.

[17] On January 7, 2020, the juvenile court entered its termination order. The juvenile court's order provides, in part, as follows:

> 17.  Child C.S. was adjudicated to be a CHINS on October 7, 2016, when [Mother] admitted to an amended CHINS

allegation. On that same date, Father waived his right to a "Fact Finding Hearing."

18. On October 28, 2016, the CHINS Court proceeded to disposition, and Father was ordered to participate in random drug screens and to participate in a Father Engagement program. The Parental Participation Order noted that any request for a drug screen that was not completed in a timely manner would result in a positive result. Child C.S. remained placed in [Father's] care and custody. On March 16, 2018, Father's dispositional decree was modified, and he was ordered to participate in home based therapy, home based case management, and random drug screens.

19. By the time of the October 13, 2017 "Periodic Review Hearing," Father had tested positive for THC.

20. On October 28, 2017, an incident occurred in which Father used inappropriate discipline on [L.L.] after [L.L.] tried to damage a table.

21. During this incident, Father confined [L.L.] to a chair using a belt. Father was arrested. However, any criminal charges were dismissed.

22. On October 31, 2017, the CHINS Court ordered [C.S.] to be removed from [Father's] care and custody and authorized the child be placed in foster care or therapeutic foster care. The child was removed from [Father's] care and custody pursuant to the dispositional decree.

23. Following child C.S.'s removal on October 31, 2017, he was placed into relative care with Maternal Aunt.

24. A CHINS Petition was filed on [K.S.] on November 1, 2017, under Cause Number 49D09-1710-JC-003639 (later renumbered to 49D15-1710-JC-003639), following allegations that Father failed to provide the child with a safe, stable, and appropriate living environment free from substance abuse and violence (2017 CHINS case).

25. [K.S.] was removed from [Father's] care and custody at the November 1, 2017 Initial/Detention Hearing. Child K.S. was placed with Maternal Aunt in kinship care.

26. [K.S.] was adjudicated to be a CHINS under the 2017 CHINS case on February 23, 2018 when [Father] admitted to an amended CHINS allegation. Specifically, "Child K.S. is in need of services pursuant to Indiana law, as defined in IC 31-34-1, because Father would benefit from services to assist Father in providing a safe, stable, and appropriate home and one with proper supervision, and therefore, the coercive intervention of the court is necessary."

27. On March 16, 2018, the CHINS Court proceeded to disposition. Father was ordered to participate in home based therapy; home based case management; and random drug screens. Child C.S. remained removed from [Father's] care and custody pursuant to the dispositional decree.

28. On January 31, 2018, the CHINS Court suspended Father's parenting time as to both children. He has not seen them since.

29. Father has been advised by the CHINS Court that parenting time would be reinstated once he engages in court ordered services.

30. [Pogue] of Ireland Homebased Services, was referred to provide home based case management for Father around Thanksgiving 2018.

31. [Pogue] established several goals for Father, including housing; employment; budgeting; and reunification.

32. [Pogue] offered transportation for Father so that he could attend a mental health appointment. He declined. He also declined to be transported to a psychosexual assessment.

33. [Pogue] only met with Father one time, on December 5, 2018.

34. [Pogue] texted or called Father weekly to set appointments. Father did not respond.

35. In April 2019, [Pogue] closed Father unsuccessfully due to non-compliance.

36. During the time he was working with [Pogue], Father resided with various relatives.

37. [Heisserer] of Ireland Homebased Services was referred to provide home based therapy beginning in October 2018.

38. [Heisserer] was based in Terre Haute Indiana. At the time, Father resided in Cunot Indiana with his mother, which is near Terre Haute.

39. Father informed [Heisserer] that he did not need home based therapy.

40. Father reported to [Heisserer] that he had vertebrae issues which limited his employment opportunities.

41. Father informed [Heisserer] that he didn't need coping skills.

42. Out of ten (10) possible sessions with [Heisserer], Father appeared for six (6).

43. In January 2019, Father moved to Indianapolis so his participation became inconsistent.

44. [Heisserer]'s last session with Father was in January 2019 at an Indianapolis White Castle.

45. [Heisserer] believes that Father needs a psychological evaluation.

46. [Heisserer] transferred the referral to an Indianapolis location in April 2019.

47. Father made no progress toward his goals while working with [Heisserer].

48. The FCM has made multiple referrals for home based therapy and home based case management. Neither of these services have been successfully completed.

51. Father has submitted drug screens for nearly three years. His participation has been inconsistent. He has missed numerous screens and had no screens during the months of January and February of 2018.

52. Father has submitted approximately ten (10) screens which were positive for marijuana.

53. Father has only submitted three (3) screens since March 2019, and none since June 2019.

55. [Cornett] of Ireland Home Based Services was referred to provide home based therapy for Father beginning in May 2019.

56. [Cornett] attempted to establish goals for Father. However, Father advised her that he doesn't need therapy.

57. Father has made no recent progress with [Cornett]. He has been non-compliant and not engaged.

58. [Cornett] has not met with Father since June 6, 2019.

59. [Cornett] has attempted to contact Father, but he has been non-responsive.

60. Home based case management has been referred at least three (3) times and has not been successfully completed.

61. Father has not had stable housing since the duration of the CHINS case. He has resided with various relatives back and forth from Poland, Indiana and Indianapolis.

62. Father would not disclose his address to the FCM when he was residing in Indianapolis.

63. Father is currently residing with his mother in Poland Indiana after previously residing with a cousin. He has no home of his own.

64. Home based therapy has been referred at least three (3) times for Father to address is trauma and has not been successfully completed. At times, he would refuse to talk to his home based therapist.

[....]

71. There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside of the home will not be remedied by [Father]. Father has had well over three (3) years to put forth an effort and has not done so. Stability and lack of participation remain major concerns. He has repeatedly refused to comply with court ordered services insisting that they are unnecessary.

72. Continuation of the parent-child relationship poses a threat to the [C]hildren's well-being in that it would serve as a barrier for them obtaining permanency through an adoption when [Father] is unable and unwilling to provide permanency and parent. The [C]hildren are thriving in their current placement and Father has had no parenting time in nearly two (2) years. Father also allowed the [C]hildren to have contact with Mother when he knew she was on drugs, in violation of a Court order.

73. Termination of the parent-child relationship is in the [C]hildren's best interests. Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met. The [C]hildren are thriving and comfortable in their placement. This is the only home they have ever really known.

Appellant's App. Vol. II pp. 28–30.

# Discussion and Decision

[18] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v.*

*Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Moreover, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interests in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id*. The Indiana Supreme Court has made clear that the "purpose of terminating parental rights is not to punish parents, but to protect the children." *Egly v. Blackford Cty. Dep't. of Pub. Welfare*, 592 N.E.2d 1232, 1234–35 (Ind. 1992). The *Egly* Court also explained that "[a]lthough parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents." *Id*. at 1234. Termination of parental rights is proper where the children's emotional and physical development is threatened. *In re T.F.*, 743 N.E.2d at 773. The juvenile court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[19] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider

the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[20] Indiana Code section 31-35-2-4(b)(2) governs what DCS must allege and establish to support the termination of parental rights, and, for purposes of our disposition, that was:

> (A) that [t]he child has been removed from the parent for at least six (6) months under a dispositional decree[;]
>
> > [….]
>
> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied [or]
> >
> > (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.

[….]

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only establish one of the circumstances described in the subsection, two of which are listed above. Father contends that DCS failed to establish that (1) there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside Father's home will not be remedied, (2) continuation of the parent–child relationship poses a threat to the Children's well-being, and (3) termination is in the Children's best interests.

# I. Indiana Code Section 31-35-2-4(b)(2)(B)(i)

[21] Father argues that DCS has failed to establish that there is a reasonable probability that the reasons for the Children's continued removal would not be remedied. In making such a determination, a juvenile court engages in a two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying the children's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted). The statute focuses not only on the initial reasons for removal "but also those bases resulting in continued placement outside the

home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. In making this second determination, the juvenile court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re D.D.*, 804 N.E.2d at 266. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[22] Here, the reasons for the Children's removal from Father's care were concerns about substance abuse and his violent tendencies, as illustrated by an incident involving L.L. during which Father disciplined him by dragging him down the hallway by the ankles and strapping him to a chair with a belt. As for the reasons for the initial removal, Father essentially argues that the allegation of inappropriate discipline of L.L. was unproven and did not results in criminal charges. The juvenile court, however, found that the incident with L.L. had occurred, based, at least in part, on FCM Smith's testimony that she had seen bruising on L.L.'s ankles. Father's argument in this regard amounts to nothing more than a request to reweigh the evidence, which we will not do. *In re S.P.H.*, 806 N.E.2d at 879.

[23] As for the juvenile court's determination that the conditions that justified the continued removal of the Children were not likely to the remedied, we conclude that it was also supported by sufficient evidence. The juvenile court found that (1) Father had failed to participate in, much less successfully complete, court-ordered home-based therapy and case-management; (2) Father had missed

numerous drug screens and had tested positive for marijuana approximately ten times; (3) DCS had arranged for (and offered transportation to) psychological and psycho-sexual evaluations, to which Father had declined to submit; (4) Father had consistently denied that he needed therapy or coping skills; and (5) Father had not established a stable residence. Father does not challenge any of these findings, arguing instead that he did not participate in various services and evaluations because they were not necessary and/or due to his frustration that the service providers changed an unusual number of times. To the extent that Father's arguments may be supported by evidence in the record, the juvenile court was under no obligation to credit such evidence, and apparently did not. Again, this argument amounts to nothing more than an invitation to reweigh the evidence, which we will not do. *Id*. at 879. The juvenile court did not clearly err in concluding that the reasons for the Children's removal and continued placement in foster care were not likely to be remedied.[1]

## II. Indiana Code Section 31-35-2-4(b)(2)(C)

[24] Father also argues that the juvenile court erred in concluding that termination of his parental rights was in the Children's best interests. We are mindful that, in determining what is in the best interests of the Children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185,

---

[1] Because of our disposition of this claim, we need not address Father's claim that the juvenile court erred in concluding that there is reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the Children. *See* Ind. Code § 31-35-2-4(b)(2)(B)(ii).

203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992). FCM Bingham opined at the termination hearing that termination was in the Children's best interests to terminate Father's parental rights because they do not have a bond with him and he had "not demonstrated that he is able to keep these children safe to provide a permanen[t] living situation for them." Tr. pp. 152–53, GAL Iverson also opined that termination was in the Children's best interests. While this testimony is likely sufficient to support a finding that termination is in the Children's best interests, is does not stand alone.

[25] As mentioned, there is ample evidence to support a conclusion that Father cannot—or will not—provide the Children with a safe and stable home. Moreover, there is ample evidence that Father is in denial, having resisted any attempt to address the issues that contribute to that state of affairs, including substance abuse and his propensity for violence. Father's refusal to address these issues has manifested itself in his inconsistent compliance with drug screens, failure to complete home-based therapy and case management, and refusal to submit to psychological and psycho-sexual evaluations.

[26] The juvenile court also heard evidence that the Children were thriving in their current placement with Mother's sister, who has indicated that she is willing to adopt them. FCM Bingham testified that the Children are "thriving" in

Mother's sister's care, "doing really well[,]" and "bonded together."  Tr. p. 151. FCM Bingham also opined that "[i]t would be devastating to remove them from their current environment and place [them] anywhere else, at this time that is all they know, is their current placement."  Tr. p. 153.  In light of the evidence of Father's failure to address his issues and the very positive nature of the Children's pre-adoptive placement, we conclude that the record contains more than enough evidence to support the juvenile court's conclusion that termination was in the Children's best interests.

[27] The judgment of the juvenile court is affirmed.


Najam, J., and Mathias, J., concur.